[Cite as *Sangeri v. Yerra*, 2020-Ohio-5520.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Ashok K. Sangeri, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 19AP-675 |
| v. | : | (C.P.C. No. 17DR-4265) |
| Sahitya Yerra, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

N U N C   P R O   T U N C[1]

D E C I S I O N

Rendered on December 3, 2020

**On brief:** *Wood Long Family Law*, and *Jessica M. Wood*, for appellant. **Argued:** *Jessica M. Wood.*

**On brief:** *Sanjay K. Bhatt*, for appellee. **Argued:** *Sanjay K. Bhatt.*

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

BRUNNER, J.

{¶ 1} Plaintiff-appellant, Ashok K. Sangeri, appeals from the judgment entry and final divorce decree entered by the Franklin County Court of Common Pleas, Division of Domestic Relations on September 4, 2019. For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Sangeri and defendant-appellee, Sahitya Yerra, entered into an arranged marriage on April 17, 2016. No children were born as issue of the marriage. The parties separated just over one year after the marriage. On November 20, 2017, Sangeri filed a complaint for divorce. On February 10, 2018, Yerra filed her answer; she did not file a

---

[1] This decision replaces the previous decision filed on December 1, 2020 that was not in final format.

counterclaim. On January 15, 2019, Sangeri filed an amended complaint to include, as an additional ground for divorce, that the parties were living separate and apart without cohabitation for more than one year. Yerra did not contest that allegation.

{¶ 3} During the pendency of the case, Yerra filed a motion for temporary orders. Upon review of the parties' respective affidavits and in consideration of the parties' incomes, assets, and liabilities, the magistrate ordered Sangeri to pay spousal support in the amount of $1,500 per month for 8 months, commencing February 1, 2018. On June 21, 2019, the trial court denied Sangeri's motion for a de facto termination date of the marriage.

{¶ 4} A contested two-day trial was conducted on June 25 and 26, 2019, before a judge of the Division of Domestic Relations. It is undisputed that the parties were married in India on April 17, 2016, and that their parents had brokered the marriage. At the time of their engagement, Yerra lived in India, whereas Sangeri was living in Columbus, Franklin County, Ohio and working for L-Brands, where he had been employed for approximately 8 years at that time. Sangeri earned $125,103 in 2016 and $126,900 in 2017 at L-Brands.

{¶ 5} It also is undisputed that Yerra, after becoming engaged to Sangeri, came to the United States on a student visa and began her studies at New Hampshire University. Yerra testified she wanted to transfer to Indiana Technical University in order to be closer to Sangeri, but he did not agree to the transfer.

{¶ 6} The parties dispute the basis for their marriage. Yerra asserted throughout her testimony her belief that she was fraudulently induced to marry Sangeri. She testified that, not long after their wedding, Sangeri told her he only married her so that his younger brother could marry. Yerra testified Sangeri and she returned to India for the wedding of Sangeri's younger brother. Thereafter, Sangeri told her that, with his brother's marriage accomplished, the purpose of their own marriage was over, and he was going to file for divorce.

{¶ 7} Sangeri disputed Yerra's account of these events. He testified that he entered the marriage at his parents' instigation. He also testified that his brother did not meet the woman he later married until after Sangeri's engagement to Yerra. Sangeri testified that it was his understanding at the time he became engaged to Yerra that Yerra planned to come to the United States on a dependent visa until she could secure a student visa and attend the New Hampshire University. Sangeri testified that, after the parties' wedding in India,

they returned to the United States separately, about two days apart. Sangeri returned to Columbus, and Yerra returned to New Hampshire. Sangeri testified that the parties' relationship after their wedding was good, and that they spoke regularly and met many times. He testified that he noticed a shift in Yerra's attitude toward him when they went to India for his brother's wedding. He described their subsequent communications as argumentative and the marriage as "rocky." (June 25, 2019 Tr. at 40.) Sangeri testified his relationship with Yerra continued to deteriorate to the point that he told her he thought their marriage was over, and he felt she agreed. Sangeri testified that he sought legal advice to terminate the marriage in September 2017. He filed for divorce November 20, 2017.

{¶ 8} Yerra testified that, while she was attending school in New Hampshire, she wanted to come to Columbus to visit Sangeri, but that Sangeri dissuaded her, claiming financial distress and refusing to pay for Yerra's travel to Columbus. Sangeri denied refusing to have Yerra visit but acknowledged he had not wanted to purchase the more expensive airline tickets for last-minute trips because it was a financially stressful time for him.

{¶ 9} Yerra disputes Sangeri's claim of financial stress, testifying that he received income as a silent partner in an information technology service company, Telligen Tech. Sangeri denied being a silent partner in Telligen Tech or receiving income from it. He testified the company belonged to friends he helped out occasionally, even lending them substantial amounts of money while he was married to Yerra. He acknowledged the company has office locations at Airport Drive in Columbus, Ohio and in Hyderabad, India. Yerra also pointed to money Sangeri transferred to India, asserting the money was to pay Telligen Tech employees in India. Sangeri denied Yerra's assertion, testifying that the money transfers of $9,996 and $16,491 he made during the marriage were to his family and friends in India.

{¶ 10} Yerra testified that, following her graduation from university, she continued to be in the United States on a student visa, on Optional Practical Training ("OPT") status. The expiration date of her OPT status was August 2020, with no guarantee that it would be renewed. Yerra's employment required her to live in the New York/New Jersey area. She testified that her net income was $4,000 a month. She shared a 3-bedroom home with 4 to 5 people, and her monthly rent fluctuated from $1,000 to $2,000, depending on the

number of people living in the house. She incurred additional expenses for transportation, food, and other necessities.

{¶ 11} Yerra testified she wanted to stay married to Sangeri. She stated she would be the first person in her community to be divorced and was reluctant to return to India, due to the stigma attached to a divorced woman.

{¶ 12} After the trial concluded, the parties submitted their respective proposed findings of facts and conclusions of law.

{¶ 13} On September 4, 2019, the trial court issued a judgment entry for decree of divorce, findings of fact and conclusions of law. The trial court found that the duration of the marriage was from April 17, 2016 to June 26, 2019. The trial court granted the divorce to Sangeri on the grounds that the parties had lived separate and apart for a period in excess of one year without cohabitation. Additionally, the trial court allocated martial and non-marital assets and made a distributive award to Yerra. Based on the parties' testimony and evidence adduced at trial, the trial court set forth in the divorce decree the following conclusions of law, directly addressing the parties' respective credibility:

> This Court is vested with broad discretion when fashioning a division of both marital property and marital debt. The award need not be equal but it must be equitable. The Court considers that spousal support is justifiable in this case, but based on the positions of the parties, a strict division of assets as revealed in testimony and by evidence presented at trial, as well as an award to [Yerra] for Attorney Fees, may be most appropriate in this matter. Awarding [Yerra] all marital equity in the Claver Condo is an appropriate substitute for spousal support in this matter. [Sangeri] attempts to make arguments for reducing the marital equity in the home based on the argument that "he alone contributed". The Court rejects this argument as an inappropriate attempt to reintroduce a de facto termination theory of the case, which with this Court has already disposed.

> [Yerra] testified she believed she was fraudulently induced to marry [Sangeri] in a scheme for an elder brother to marry first in order that [Sangeri's] younger brother be able to make a match considered advantageous to his family. The Court heard persuasive testimony on this topic. But the Court does not need to make a determination on these emotionally-laden matters in order to craft an equitable award based on the needs and relative dependencies of the parties.

> [Yerra] credibly demonstrated, through testimony and evidence, that she is vocationally vulnerable due to her visa limitations in the United States. Equally persuasive was her testimony that she is reluctant to return to her home country where she would face extreme stigma in her own culture of being a divorced woman, and [] lacks significant personal resources.
>
> The Court found [Sangeri] to lack credibility on the issues of transfers he made before filing for divorce and regarding his role in Telligen Tech. [Yerra] and her Counsel were required to expend time and resources to substantiate funds due to [Sangeri's] lack of transparency and non-disclosures. If full transparency existed, it may be that [Sangeri's] assets are far greater than what has been established in this Court.

(Decree of Divorce at 5-6.)

{¶ 14} The trial court, based on its findings of fact and conclusions of law, issued the following orders in the division of property section of the divorce decree:

> 1. Yerra was awarded all the marital equity of $18,210.43 in the rental property located at 4120 Claver Drive, Columbus, Ohio ("Claver Condo"). The trial made this award in lieu of spousal support.
>
> 2. Sangeri was ordered to pay Yerra the following sums of money:
>
> - $19,563, the amount equal to one-half the funds Sangeri withdrew prior to filing for divorce;
>
> - $9,996, the amount equal to one-half the marital funds transferred to India;
>
> - $20,000, the amount equal to one-half the monies Sangeri was then known to have received from Telligen Tech during the marriage;
>
> - $16,491, the amount equal to the funds Sangeri transferred to his friends and family prior to filing for divorce.
>
> 3. Each party to maintain their bank accounts as titled in their own name.

- Each party to retain any and all personal property in their respective possession and control, including jewelry, household goods, and furniture.

- Sangeri to retain the 2007 Infiniti G35 and any other vehicles in his possession.

(Decree of Divorce at 7-9.)

{¶ 15} Additionally, the trial court found there was no marital debts.

{¶ 16} The trial court awarded Yerra $10,000 in attorney fees and ordered Sangeri to pay the same.

{¶ 17} Finally, the trial court issued orders regarding the parties' stipulations with respect to determining the marital value of Sangeri's 401(k) plan with L-Brands, a Morgan Stanley investment account, and an AST Equity Plan Solutions account.

{¶ 18} In conclusion, the trial court stated it was "not required to make factual findings regarding each piece of evidence, and the omission of a fact from this decision does not suggest that the court did not consider that fact." (Decree of Divorce at 11.)

{¶ 19} Sangeri now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 20} Sangeri presents for our review 11 assignments of error:

[1.] The trial Court erred and abused its discretion by granting 100% of the equity in the 4120 Claver Drive property to [Yerra].

[2.] The trial court erred and abused its discretion by ordering [Sangeri] to pay $20,000 to [Yerra].

[3.] The trial court erred and abused its discretion by ordering [Sangeri] to pay $19,563 to [Yerra].

[4.] The trial court erred and abused its discretion by ordering [Sangeri] to pay $9,996 to [Yerra].

[5.] The trial court erred and abused its discretion by ordering [Sangeri] to pay $16,491 to [Yerra] to the extent this was ordered twice.

[6.] The trial court erred and abused its discretion by granting $10,000 in attorney fees to [Yerra].

[7.] The trial court erred and abused its discretion by finding the jewelry given to the parties as part of their wedding ceremony was [Yerra's] separate property.

[8.] The trial court erred and abused its discretion by finding there was no marital debt.

[9.] The trial court erred and abused its discretion by failing to find the parties['] bank accounts to be marital assets and failing to equitably divide such.

[10.] The trial court erred and abused its discretion by ordering [Sangeri] to pay to [Yerra] one-half the marital value of the L-Brands Stock.

[11.] The trial court erred and abused its discretion by ordering a division of assets and debts that was not equitable.

## III. DISCUSSION

### A. Determination and Division of Marital Property

{¶ 21} Ten of Sangeri's 11 assignments of error—all except his *s*ixth assignment of error regarding attorney fees—relate to the trial court's determinations regarding the parties' marital and non-marital property and how to divide any marital property equitably. We first address those 10 assignments of error.

#### 1. Law and Standards of Review

{¶ 22} In divorce proceedings, the trial court is required to determine what constitutes marital property and what constitutes separate property. R.C. 3105.171(B). Marital property does not include separate property. R.C. 3105.171(A)(3)(b). Separate property is defined by statute, in relevant part, as "[a]ny gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse." R.C. 3105.171(A)(6)(a)(vii). The statute further provides that the commingling of separate property with any other type of property does not destroy its identity, unless the separate property is not traceable. R.C. 3105.171(A)(6)(b). When the parties contest whether an asset is marital or separate property, it is presumed to be marital property unless proven otherwise. *Wolf-Sabatino v. Sabatino*, 10th Dist. No. 10AP-1161, 2011-Ohio-6819, ¶ 11. The party requesting that an asset be classified as separate property bears the burden of tracing it to his or her separate property. *Id.*

{¶ 23} We review a trial court's determination of property as marital or separate under a manifest weight standard and will affirm a trial court's determination if it is supported by some competent, credible evidence. *Roush v. Roush*, 10th Dist. No. 15AP-1071, 2017-Ohio-840, ¶ 18, citing *Banchefsky v. Banchefsky*, 10th Dist. No. 09AP-1011, 2010-Ohio-4267, ¶ 36.

{¶ 24} After determining what constitutes marital property and what constitutes separate property, the court is required to divide the marital and separate property equitably. R.C. 3105.171(B). With respect to marital property, R.C. 3105.171(C)(1) provides that marital property shall be divided equally, unless an equal division would be inequitable, in which case the property shall be divided in the manner the court determines equitable. The trial court must value the marital property to determine an appropriate division. *See Raymond v. Raymond*, 10th Dist. No. 11AP-363, 2011-Ohio-6173, ¶ 22 ("To comply with its duty [under R.C. 3105.171(C)(1)], the trial court must value and divide all marital property in a divorce, and in most cases, the failure to do so amounts to an abuse of discretion. Although a trial court possesses broad discretion to determine the value of marital property, it may not omit valuation altogether.") (citations omitted).

{¶ 25} We review a trial court's determination of the value of marital property for abuse of discretion. *Beagle v. Beagle*, 10th Dist. No. 09AP-353, 2009-Ohio-6570, ¶ 11 ("A trial court has broad discretion to determine the value of marital property, and its determination will not be disturbed on appeal absent an abuse of that discretion."); *Grody v. Grody*, 10th Dist. No. 07AP-690, 2008-Ohio-4682, ¶ 20 ("A trial court has broad discretion in developing a measure of value for property in a divorce case.").

### 2. First Assignment of Error

{¶ 26} In his first assignment of error, Sangeri asserts the trial court erred and abused its discretion by granting 100 percent of the equity in the Claver Condo to Yerra. The trial court found Sangeri's assertion essentially renewed his motion for a de facto termination date of the marriage, a motion the trial court had already denied. We agree.

{¶ 27} It is undisputed that Sangeri purchased the Claver Condo in January 2017, while the parties were married. The trial court determined that the Claver Condo is marital property.

{¶ 28} In the divorce decree, the trial court explicitly found it was more appropriate and equitable to award Yerra the full amount of the condo's equity in lieu of spousal support. The trial court found that "[c]redible testimony and evidence was shown to indicate [Sangeri] wanted [Yerra] to be dependent on him, he maintained financial control in such a manner that she was dependent on him, and the marriage itself was arranged in a way to increase her dependence." (Decree of Divorce at 4.) The trial court explained that its reasoning in making this award "is based on observation and weighing of the credibility of each party, the lack of transparency by [Sangeri] regarding financial transactions, and the clear disparity of income and financial vulnerability which puts [Yerra] in a weaker position." (Decree of Divorce at 7.) Additionally, as noted previously, the decree contains the trial court's specific rejection of Sangeri's argument that he alone contributed to the Claver Condo, finding his argument "an inappropriate attempt to reintroduce a de facto termination theory of the case, which with this Court has already disposed." (Decree of Divorce at 6.)

{¶ 29} "The first step in making an equitable distribution of marital property is to determine the duration of the marriage." *Heyman v. Heyman*, 10th Dist. No. 05AP-475, 2006-Ohio-1345, ¶ 31. R.C. 3105.171(A)(2)(a) creates a presumption that the term of a marriage for purposes of property valuation is the time from the date of the marriage through the date of the final hearing in an action for divorce. *Meeks v. Meeks*, 10th Dist. No. 05AP-315, 2006-Ohio-642, ¶ 50. If the court determines use of that date would be inequitable, however, it may select a termination date that it considers equitable. R.C. 3105.171(A)(2)(b). "[A] trial court may use a de facto termination of marriage date when the evidence clearly and bilaterally shows that it is appropriate based upon the totality of the circumstances." *Meeks* at ¶ 50. The court has discretion whether to use the final hearing date or a de facto termination date and this decision is subject to review for abuse of discretion. *Id.*

{¶ 30} In the matter before us, the trial court's explanation as to why it rejected the de facto termination date of the marriage requested by Sangeri is supported by competent, credible evidence. The trial court's decision clearly sets forth a rational evidentiary basis for awarding Yerra the full marital equity in the Claver Condo. Moreover, the trial judge was best situated to access the credibility of the witnesses and the evidence. Therefore, we

find the trial court did not err or abuse its discretion in making this award, and this Court will not disturb the award.

{¶ 31} Accordingly, the first assignment of error is overruled.

### 3. Depleted Marital Funds – Second, Third, Fourth, and Fifth Assignments of Error

{¶ 32} In his second, third, fourth, and fifth assignments of error, Sangeri asserts the trial Court erred and abused its discretion by ordering him to pay Yerra $20,000, representing one-half of the money Sangeri was known to have received from Telligen Tech during the marriage; $19,563, representing one-half the amount of money Sangeri withdrew before he filed for divorce; $9,996, representing one-half of the marital funds Sangeri transferred to India; and $16,491, representing one-half of the funds Sangeri transferred to his family and friends before he filed for divorce, an amount that Sangeri argues he is being ordered to pay twice.

{¶ 33} The decree contains the trial court's rationale with respect to these four orders. The trial court determined that, based on Sangeri's affidavit of property and credible evidence adduced at trial, the record demonstrated that Sangeri had depleted marital assets prior to filing for divorce. The decree contains the trial court's findings of fact based on testimony, including the following:

> d. Credible testimony, including admissions by [Sangeri], during the trial suggest that [Sangeri] is a silent partner in * * * Telligen Tech * * *. The Court is convinced that sufficient testimony and physical evidence was shown at trial to support a finding that [Sangeri] has unreported ownership stake or some form of business relationship in or with this company that increases his assets and access to capital. The parties do not appear to be in a position to undertake a more thorough forensic analysis. Consequently, the Court must simply include this evidentiary issue in its weighing of equities.

> e. [Sangeri] received a check on June 6, 2017 for $40,000 from Telligen Tech. [Sangeri] claimed the check was a repayment for a loan made to the company. Credible testimony and physical evidence shows [sic] that this amount represents potential income to [Sangeri]. Whether it is income or a loan, there are no credible business documentation to support [Sangeri's] position in the matter. It is, at the very least, an informal transfer of marital property. Therefore, the Court will treat it as a marital asset.

* * *

g. [Sangeri] testified that he sought legal advice to terminate his marriage around September 2017. He filed for divorce November 20, 2017.

h. [Sangeri] holds the following accounts. According to credible testimony and evidence, various sums totaling $39,125.93 were withdrawn in close proximity to [Sangeri] filing for divorce:

    i.   Digital Federal Credit Union (DCU) # *849

    ii.  Chase Bank # *839

[Sangeri] was unwilling or unable to state a credible or appropriate business or personal reason for these transfers.

i. [Sangeri] transferred funds totaling $19,992.29 to India from 2/1/17 to 5/28/19. [Sangeri] contends these funds were to his parents for support. [Yerra] testified the transfers were related to [Sangeri's] interest in Telligen Tech and its India operations. The parties were subject to a Standard Mutual Temporary Restraining Order November 21, [2017][2]. The Court finds that regardless of the purpose of the transfers, they were not exempted by the TRO, as they are not "day to day spending" in the sense of the agreement[.]

j. In his Affidavit of Property, [Sangeri] acknowledged transfers to friends and family totaling $32,982. These transfers included $20,000 to Telligen Tech principal Ashwin Puppala. [Sangeri] was unwilling or unable to state a credible or appropriate business or personal reason for these transfers. He claimed he wanted to "help his friends." The Court does not find this to be an appropriate answer and the large transfer in particular raises questions about whether [Sangeri] and the recipient of this large gift followed applicable federal regulations for cash transfers. In any event, the Court considers these marital assets depleted without the consent or knowledge of [Yerra], and [Sangeri] is required to make her whole.

(Decree of Divorce at 3-5.)

{¶ 34} In the divorce decree, the trial court summarized its findings that Sangeri had depleted these martial assets, stating:

---

[2] A typographical error in the September 4, 2019 divorce decree states the TRO issued November 21, 2019. The record in this matter clearly reflects that the TRO issued November 21, 2017, the day after Sangeri filed his divorce complaint.

> [Sangeri] seeks to ignore this depletion of these marital assets and additionally credit him $4,613.50 for a payment made to [Yerra] that he had already been required to pay, had not paid, and made the payment in Court. The Court will not countenance either argument. It is clear from the evidence and testimony provided that [Sangeri] not only depleted marital assets prior to divorce, he transferred funds to India outside the mutual standard Temporary Restraining Order; and displayed a thorough lack of transparency regarding his assets and interests. [Sangeri's] behavior amounts to either willful or reckless financial misconduct. The Court addresses this imbalance by requiring [Sangeri] to make payment of these funds to [Yerra] as her half of marital assets that were either willfully or recklessly depleted.

(Decree of Divorce at 8.)

{¶ 35} Both parties provided conflicting testimony as to the source and dispersal of these funds. The trial court found Yerra's testimony credible and Sangeri's testimony not credible. Moreover, the trial court found Sangeri's actions violated the mutual standard temporary restraining order the trial court had issued.

{¶ 36} "It is the place of the trial court, not the reviewing court, to assess the credibility of the witnesses." *Heyman* at ¶ 18. Under the circumstances in this case, we conclude there was competent, credible evidence to support the trial court's conclusions and, therefore, the findings that Sangeri willfully or recklessly depleted these funds. Consequently, there is no abuse of discretion.

{¶ 37} The second, third, fourth, and fifth assignments of error are overruled.

**4. Jewelry – Seventh Assignment of Error**

{¶ 38} Sangeri's seventh assignment of error asserts the trial court erred and abused its discretion by finding the jewelry given to the parties as part of their wedding ceremony was Yerra's separate property.

{¶ 39} In divorce proceedings, the trial court is required to determine what constitutes marital property and what constitutes separate property. R.C. 3105.171(B). Marital property does not include separate property. R.C. 3105.171(A)(3)(b). Separate property is defined by statute, in relevant part, as "[a]ny gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse." R.C. 3105.171(A)(6)(a)(vii). The statute further provides that the commingling of separate

property with any other type of property does not destroy its identity, unless the separate property is not traceable.  R.C. 3105.171(A)(6)(b).  When the parties contest whether an asset is marital or separate property, it is presumed to be marital property unless proven otherwise.  *Wolf-Sabatino* at ¶ 11.  The party requesting that an asset be classified as separate property bears the burden of tracing it to his or her separate property.  *Id.*  We review a trial court's determination of property as marital or separate under a manifest weight standard and will affirm a trial court's determination if it is supported by some competent, credible evidence.  *Roush* at ¶ 18, citing *Banchefsky* at ¶ 36.

{¶ 40} The parties gave conflicting testimony regarding who had provided the jewelry to whom and when. Sangeri testified that he and Yerra received gold jewelry from her parents and his parents.  He stated he had received a bracelet, a ring, and a necklace chain, while she received a couple of necklaces.  However, Sangeri was unable to produce any admissible documentary evidence to support his testimony that his parents had purchased some of the jewelry and the jewelry provided by both sets of parents had been given to the parties jointly.

{¶ 41}  Yerra testified that no jewelry in her possession had been given to her by Sangeri's parents.  She acknowledged that she had had some jewelry while she was staying with Sangeri in Columbus, but she had taken that jewelry with her when the parties traveled to India for the wedding of Sangeri's younger brother and left it with her parents when she returned to the United States.  Yerra testified on cross-examination that the jewelry that was given to her at her wedding was purchased by her parents, and that was the jewelry she left with her parents.  On redirect, she testified that neither Sangeri nor his parents had given her any jewelry at the time of the parties' wedding or thereafter.  She stated that the jewelry Sangeri was describing had been given to her by her parents prior to her marriage.

{¶ 42}  In the divorce decree, the trial court found that the jewelry belonged solely to Yerra and thus was not marital property.  The trial court explained its finding as follows:

> [Sangeri] claims he gave certain jewelry, valued according to his estimate to be $20,000, to [Yerra] which he now deems marital property. He provided grainy black and white photos and "receipts" as evidence. The Court is unable to make any determination regarding the composition or value of the jewelry in these photos. The "receipts" shown appear to be a calculation of numbers written on a jewelers' letterhead. [Sangeri] fails to establish any relationship between the

"receipts" and the jewelry in the photos, and has also not established that he purchased the jewelry at all, or that he gave it to [Yerra]. Any jewelry in [Yerra's] possession, or any she placed with her family, is her separate property and shall remain her separate property. [Sangeri's] attempts to raise an issue of [Yerra] not including wedding jewelry on her Affidavit of Property, but, in the Court's view, the inclusion of wedding jewelry on Property Affidavits is not typical.

(Decree of Divorce at 9.)

{¶ 43} To the extent Sangeri challenges the credibility of Yerra's testimony, those issues were raised at trial and the trial court was able to consider them in evaluating and weighing the evidence. The trial court found that Yerra's testimony overcame the presumption that the jewelry was marital property. "It is the place of the trial court, not the reviewing court, to assess the credibility of the witnesses." *Heyman* at ¶ 18. Although nothing in the record appears to support the trial court's finding that "the inclusion of wedding jewelry on Property Affidavits is not typical," we find that to be harmless error. (Decree of Divorce at 9.) Under the circumstances in this case, we conclude there was competent, credible evidence to support the trial court's conclusion and, therefore, the finding that the jewelry was Yerra's separate property was not against the manifest weight of the evidence.

{¶ 44} The seventh assignment of error is overruled.

### 5.  Eighth Assignment of Error

{¶ 45} In his eighth assignment of error, Sangeri asserts the trial court erred and abused its discretion by finding there was no marital debt.

{¶ 46} In its findings of fact, the trial court found that "[Sangeri's] credit card liabilities include $2,164.07 (Chase Bank) and $14,946.99 (Bank of America). [Sangeri] confirmed that a portion was for payment of his attorney fees, and did not confirm the sources of the other liabilities." (Decree of Divorce at 5.)

{¶ 47} In the divorce decree, the trial court stated it did not find any marital debt in this matter.

{¶ 48} The property to be divided in a divorce proceeding includes not only the parties' assets but also any debts incurred by the parties. *Marrero v. Marrero*, 9th Dist. No. 02CA008057, 2002-Ohio-4862. Marital debt has been defined as any debt incurred during the marriage for the joint benefit of the parties or for a valid marital purpose.

*Ketchum v. Ketchum,* 7th Dist. No. 2001 CO 60, 2003-Ohio-2559, citing Turner, *Equitable Distribution of Property*, Section 6.29, at 455 (2d Ed.1994, Supp.2002).

{¶ 49} Sangeri's testimony indicated that his credit card debt immediately prior to his marriage of $12,981.00, and at the time of trial was $17,111.06, an increase of $4,130.06. Sangeri also testified he paid approximately $10,000.00 to his divorce attorneys using his Chase Bank and Bank of America credit cards. He was unable, however, to provide an accounting of what amount of the debt of either of these credit cards was for and whether it related to payments to his attorneys in the underlying matter. He conceded in his brief that any monies paid to his divorce counsel via credit card may be "grounds to consider some debt not marital." (Sangeri's Brief at 37.)

{¶ 50} The parties stipulated that the allocation of credit card debt "shall be left to the determination of the Court." (Tr. at 71.) In the absence of any credible testimony or evidence as to what portion of Sangeri's credit card was for valid marital purposes, the trial court could not determine what, if any, of Sangeri's credit card debt was marital debt. Consequently, the trial court did not find it equitable under the circumstances to consider any portion of the parties' debt to be marital debt. The trial court found, therefore, no marital debt in this matter and ordered each party "to pay for and hold the other harmless on all personal debts and obligations." (Decree of Divorce at 9.) Given the record before us, we find the trial court did not abuse its discretion in reaching this determination.

{¶ 51} Accordingly, the eighth assignment of error is overruled.

### 6. Ninth Assignment of Error

{¶ 52} In his ninth assignment of error, Sangeri asserts the trial court erred and abused its discretion by failing to find the parties' bank accounts to be marital assets and failing to equitably divide such.

{¶ 53} R.C. 3105.171(F)(2) requires the trial court to consider the parties' assets and liabilities in the event the trial court makes an equitable distribution of the marital assets. The record before us demonstrates that the trial court considered this and other factors and set forth the basis for an equitable distribution in the divorce decree. As previously discussed, the trial court specifically addressed Sangeri's lack of transparency regarding financial matters as well as the evidence that Sangeri had depleted the marital assets prior to filing for divorce, violating the temporary restraining order in the process. Having

addressed those inequities, the trial court determined that, in other regards, it was equitable that each party maintain their bank accounts as titled in their own name.

{¶ 54} Yerra submits that, by ordering each party to keep their own bank accounts, the trial court made an equal division of the total bank account balances. Given the circumstances of this case, we agree, and find the trial court did not abuse its discretion in this regard.

{¶ 55} The ninth assignment of error is overruled.

### 7. Tenth Assignment of Error

{¶ 56} In his tenth assignment of error, Sangeri asserts the trial court erred and abused its discretion by ordering Sangeri to pay to Yerra one-half the marital value of the L-Brands Stock.

{¶ 57} The trial court addressed this issue under the stipulations section of the divorce decree. The parties had stipulated that 300.88457 of Sangeri's share in L-Brands, from his Employee Stock Purchase Plan, were marital property. The parties further stipulated that, as of the date of the trial, the stock price was $24.17 per share. Thus, these shares had a total value of $7,235.14, as stipulated by the parties. Divided equally, each party would receive $3,617.57.

{¶ 58} The trial court's determination incorporated the parties' stipulations as to how many shares constituted marital property and what the value of those shares was as of a date certain designated by the parties. The parties also stipulated that "[t]he division of the marital portion and whether or not it is equitable for defendant to receive value for such shall be left to the determination of the court." (Tr. at 71.) The trial court stated in the decree that the ordered distribution was determined under principles of equity. Consequently, we find the trial court did not abuse its discretion with respect to the division of the L-Brands Stock shares.

{¶ 59} The tenth assignment of error is overruled.

### 8. Eleventh Assignment of Error

{¶ 60} In his eleventh assignment of error, Sangeri asserts the trial court erred and abused its discretion by ordering a division of assets and debts that was not equitable.

{¶ 61} We disagree. For all the foregoing reasons, we find the trial court did not err or abuse its discretion in division of marital assets and debts. Accordingly, the eleventh assignment of error is overruled

**B. Attorney's Fees – Sixth Assignment of Error**

{¶ 62}  Sangeri's sixth assignment of error assets the trial court erred and abused its discretion by granting $10,000 in attorney fees to Yerra.  We disagree.

{¶ 63}  In divorce proceedings, a trial court may award "all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable." R.C. 3105.73(A).  A trial court " 'may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate' " to determine whether an award is equitable.  *Rodgers v. Rodgers*, 8th Dist. No. 105095, 2017-Ohio-7886, ¶ 60, quoting *Gentile v. Gentile*, 8th Dist. No. 97971, 2013-Ohio-1338, ¶ 69.

{¶ 64}  We have held that an award of attorney fees under R.C. 3105.73 lies within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Wehrle v. Wehrle*, 10th Dist. No. 12AP-386, 2013-Ohio-81, ¶ 47, citing *Huffer v. Huffer*, 10th Dist. No. 09AP-574, 2010-Ohio-1223, ¶ 19, citing *Parker v. Parker*, 10th Dist. No. 05AP-1171, 2006-Ohio-4110, ¶ 36.

{¶ 65}  Yerra testified that she had been able to pay only $2,500 to her attorney as of the time of trial.  In comparison, Sangeri had paid his attorneys $10,000.  Yerra directs our attention to a holding of *Rodgers* at ¶ 70:

> "Where the amount of an attorney's time and work is evident to the trier of fact, an award of attorney fees, even in the absence of specific evidence to support the amount, is not an abuse of discretion." *Dotts v. Schaefer*, 5th Dist. Tuscarawas No. 2014 AP 06 0022, 2015-Ohio-782, ¶ 17. Indeed, domestic relations courts often rely on their own knowledge and experience to determine the reasonableness of attorney fees. *See e.g., Long v. Long*, 10th Dist. Franklin No. 11AP-510, 2012-Ohio-6254, ¶ 20  ("The trial court * * * is not required to hear [expert] testimony and may rely on its own knowledge and experience to determine the reasonableness of the amount claimed."); *Lundy v. Lundy*, 11th Dist. Trumbull No. 2012-T-0100, 2013-Ohio-3571, ¶ 55  (Trial court "may evaluate the work performed by an attorney in a domestic-relations action * * * [a]nd * * * may use its own knowledge and experience to determine the reasonableness [of] the amount claimed."); *Groza-Vance v. Vance*, 162 Ohio App.3d 510, 2005-Ohio-3815, 834 N.E.2d 15, ¶ 44 (10th Dist.) (same); *Gore v. Gore*, 2d Dist. Greene No. 09-CA-64, 2010-Ohio-3906, ¶ 39.

**{¶ 66}** The trial court explained its decision on the subject matter ordering Sangeri to pay Yerra for her attorney fees:

> Due to [Sangeri's] lack of transparency regarding transfers of funds around the time of his filing for divorce, large checks written to friends and family without an identified purpose, and receipt of funds from Telligen Tech, he required [Yerra] and her Counsel to use time and resources to address these issues. Whether the financial misconduct is deliberate on the part of [Sangeri] or merely his manner of doing business, it put [Yerra] in a detrimental position. Therefore, the Court awards [Yerra] $10,000 in attorney fees, and orders [Sangeri] to pay same.

(Decree of Divorce at 10.)

**{¶ 67}** We find the trial court's award of attorney fees and expenses was readily explained and within the trial court's discretion.

**{¶ 68}** The sixth assignment of error is overruled.

## IV. CONCLUSION

**{¶ 69}** For the foregoing reasons, having independently examined the record, reviewed the parties' briefs, and listened to the parties' oral arguments, we conclude the trial court did not err in its decision. Accordingly, we overrule all eleven of Sangeri's assignments of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations.

*Judgment affirmed.*

SADLER, P.J., and NELSON, J., concur.

_____